IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


RUBEN MATTHEW SETZER                                                    PLAINTIFF

     v.              Civil No.   16-3035

JAIL ADMINISTRATOR RUSSELL
STOCKDALE; JAILER CLINT
SIMMONS; and SALVATOR D'AMICO                                        DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. §1983. Plaintiff proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in the Wrightsville Unit of the Arkansas Department of Correction (ADC). At all times relevant to this case, he was incarcerated in the Marion County Jail (MCJ). While he was at the MCJ, Plaintiff contends his constitutional rights were violated in the following ways: (1) he was denied adequate medical care; (2) he was subjected to unconstitutional conditions of confinement; (3) he was sexually assaulted when he was made to insert a suppository in his rectum in front of cellmates and Defendant D'Amico; and, (4) the grievance procedure was inadequate.

Defendants filed a summary judgment motion (Doc. 30). A hearing on the motion was scheduled for December 13, 2016, at 10:00 a.m. Plaintiff appeared by video from the Wrightsville Unit of the ADC. He objected to the hearing stating that he had not received the summary judgment motion. The hearing was adjourned.

1

Plaintiff was provided another copy of the motion. A questionnaire was propounded to assist the Plaintiff in responding to the motion. On February 21, 2017, Plaintiff filed his response to the motion (Doc. 38). The motion is now ready for decision.

## I. BACKGROUND

Plaintiff was arrested and booked into the MCJ in Yellville, Arkansas, on January 27, 2016. *Plaintiff's Response* (Doc. 38) (hereinafter *Resp.*) at ¶ 2; *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A-1 at 2.[1] Plaintiff remained incarcerated there until March 11, 2016, when he was transferred to the ADC. *Resp.* at ¶ 73.

Plaintiff had no medication with him at the time of intake. *Defts' Ex.* A-1 at 3. He indicated he had spinal surgery in October of 2015. *Defts' Ex.* A-2 at 13. He indicated he had been using methamphetamine for two years. *Id.* He also stated he had low blood sugar. *Id.*

Although Plaintiff does not recall much of what occurred on February 2, 2016, he was told that he had a seizure as a result of methamphetamine withdrawal. *Resp.* at ¶ 5; *Defts' Ex.* A-2 at 13. The MCJ did not have a doctor on site. *Resp.* at 7. As a result, Plaintiff was treated at North Arkansas Regional Medical Center in Harrison, Arkansas, for multiple rib fractures and pulmonary contusions. *Resp.* at ¶ 6; *Defts' Ex.* A-2 at 15-25. He was discharged with a prescription for Dilantin. *Defts' Ex.* A-2 at 25. Defendants never denied Plaintiff his seizure medication while he was at the MCJ. *Resp.* at ¶ 8.

Plaintiff estimated he had three or four seizures before he was taken to the hospital. *Defts' Ex.* B at 20. The seizures started when Plaintiff started "detoxing." *Id.* at 21-22.

On February 6, 2016, Plaintiff submitted a request/grievance in which he thanked jail staff

---

[1]Page references are to the jail file number located in the bottom center of the page.

for being so professional and caring when it came to his having seizures. *Resp.* at ¶ 9; *Defts' Ex.* A-3 at 59. That same day, Plaintiff reported that he slipped and fell on a wet floor and injured his back. *Resp.* at ¶ 10. Plaintiff asked to see Dr. Halsted, in Mountain Home, who he stated was his primary care physician and was his doctor when he had spinal surgery. *Resp.* at ¶ 12 & 13.

The floor was wet because of leaking toilets and "walls that leaked and sweat all the time." *Id.* at ¶ 20; *Defts' Ex.* B at 72. Plaintiff testified they would put plastic cereal bowls under the leaking toilets and they had to be emptied every six hours. *Defts' Ex.* B at 72. They took blankets, tore them up, and rolled them up and put them at the edge of the walls all around so the floor didn't get wet. *Id.* at 73.

On February 8, 2016, Plaintiff submitted a grievance about the conditions in the jail. *Defts' Ex.* A-3 at 61. He said: the sinks did not work; there was blackish mold; the walls were constantly wet; he hurt his back slipping on standing water; he could only brush his teeth every other day; he could not wash his hands after using the restroom; the cells were unsanitary; and, he was basically on 24/7 lock-down. *Defts' Ex.* A-3 at 61. In response, he was told he refused recreation that day and that he could brush his teeth daily and was allowed to have soap. *Id.*

Since the sinks were broken, Plaintiff testified they were brought a gallon jug of water, and that was the water used for drinking or washing up. *Defts' Ex.* B at 27. He stated that four men were assigned to the cell with only one toilet. *Id.* He described it as being the "worst type of old prison" with only one little tiny light. *Id.*

On February 9, 2016, Plaintiff filed a grievance in which he complained that it had been well over 24 hours since he fell and hurt his back and requested to see Dr. Halsted at Regional Family Medical. *Resp.* at ¶ 11; *Defts' Ex.* A-3 at 62. Plaintiff stated that he had been told by Defendants

D'Amico and Simmons that Defendant Stockdale indicated the doctor's office could not find Plaintiff's records. *Resp.* at ¶ 11. An appointment was scheduled for Plaintiff to see Dr. Halsted on February 19, 2016. *Defts' Ex.* A-2 at 20.

According to Plaintiff, he had to wait 13 days before seeing a doctor, and that he was not taken to the doctor until after his family called the jail. *Resp.* at ¶ 14. Plaintiff indicates it took several days before any jailer or Defendants got in touch with his doctor. *Id.* at ¶ 15.

Plaintiff was allowed to shower and was allowed outside for recreation. *Resp.* at ¶ 23. Plaintiff indicates, however, he was handcuffed and shackled every time he was allowed outside, and he could not do any recreational activities other than shuffle about. *Id.* at ¶¶ 23, 54 & 55. Outside recreation was out the back door in a small square cage. *Id.* at ¶ 53.

Plaintiff was also allowed to go to a day room. *Resp.* at ¶ 56. Going to the day room was considered recreation. *Id.* According to Plaintiff, the day room was really an "'observation room' with a toilet [and] two bunks w[h]ere other inmates slept." *Id.* at ¶ 57. The room was approximately eight to 12 feet wide and 20 feet long. *Id.* Between eight and 12 inmates were in the room at a time. *Id.* Plaintiff was not handcuffed and shackled when in the day room. *Id.* at ¶ 58. The room was locked after entry. *Id.*

On February 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, March 2, 4, 6, and 8, 2016, Plaintiff showered. *Resp.* at ¶¶ 59, 61; *Defts' Ex.* A-5 at 87-120. On February 8, 2016, Plaintiff refused recreation. *Defts' Ex.* A-5 at 88. On February 11, 12, 16, 18, 20, 22, 26, 27, and March 5, 2016, Plaintiff had recreation outside. *Resp.* at ¶¶ 60, 62; *Defts' Ex.* A-5 at 91-120.

On February 15, Plaintiff testified he had a breakdown. *Defts' Ex.* B at 36-38. After he hurt his hand beating on the door, he was allowed to call the Human Resources of Arkansas crisis hotline.

*Id.* at 38-39. The breakdown was precipitated by the death of Plaintiff's mother. *Id.* The conditions of his confinement were also part of it. *Id.* at 39. Plaintiff testified he just felt helpless. *Id.*

On February 18, 2016, Plaintiff had a seizure. *Id.* at ¶ 62. He was not injured as a result of the seizure. *Id.* Plaintiff maintains it was Defendant Stockdale who left him in his cell for 13 days without any treatment for his back injury. *Id.* at ¶ 22.

Plaintiff was seen by Dr. Halsted on February 19, 2016. *Resp.* at ¶ 16; *Defts' Ex.* A-2 at 29-31. Dr. Halsted diagnosed Plaintiff with lower back pain and lumbar disc herniation. *Resp.* at ¶ 18; *Defts' Ex.* A-2 at 30. Dr. Halsted prescribed Robaxin, Meloxicam, Prednisone, and Percocet. *Defts' Ex.* A-2 at 30. Other than a couple of occasions when Plaintiff was asleep at med call, Plaintiff received the medication on the prescribed basis. *Resp.* at ¶¶ 28 & 31-32; *Defts' Ex.* A-2 at 48-51; *Defts' Ex.* B at 45-48.

A radiologic exam of Plaintiff's lumbosacral spine was ordered. *Resp.* at ¶ 18. Follow-up treatment was also ordered. *Id.* Dr. Halsted did not indicate that Plaintiff suffered any additional injury due to Plaintiff's not being seen immediately after he fell on February 6, 2016. *Id.* at ¶ 20. Plaintiff was to follow-up on an as-needed basis. *Defts' Ex.* A-2 at 30.

On February 24, 2016, Plaintiff injured his back when leaning down to talk to an officer through the food trap in the door. *Resp.* at ¶ 24. Defendant D'Amico sent Sheriff Vickers a memo reporting the injury and the fact that they had taken Plaintiff to the North Arkansas Regional Medical Center to be looked at. *Defts' Ex.* A-4 at 72. Plaintiff was treated and released with instructions on how to treat low back strain. *Resp.* at ¶ 26; *Defts' Ex.* A-2 at 41-47.

Plaintiff testified that he also had "staph" twice, but he did not ask to be taken to the doctor for this condition. *Resp.* at ¶ 34; *Defts' Ex.* B at 50. He just assumed Defendants would not take him

to the doctor for that condition. *Defts' Ex.* B at 50; *Resp.* at ¶ 37 ("it took an act of congress just to get to the doctor whenever my back was hurt").

He had boils or staph infection on his buttocks and under one arm. *Defts' Ex.* B at 49. Plaintiff could not recall the dates on which he had the infections, but testified he did let the Defendants know of this condition. *Resp.* at ¶¶ 35-36. He did not inform the doctors about his staph infections during his visits on February 4, 19, and 24, 2016 because, at least with respect to the latter two visits, the staph infection was healed by then. *Id.* at ¶ 39; *Defts' Ex.* B at 48. He also said the jailers kept creams and bandages and stuff, and you took care of the staph infections yourself. *Defts' Ex.* B at 49.

Plaintiff indicates the Defendants determined the condition did not constitute an emergency. *Resp.* at ¶ 38. The "staph" went away after eight or nine days. *Id.* at ¶ 34.

At his initial assessment when he was transferred to the ADC, Plaintiff informed the medical staff of his continued problem with neck and back pain. *Resp.* at ¶ 28. He received Naproxen for lower back pain. *Id.* at ¶ 27. When his deposition was taken on September 30, 2016, Plaintiff testified he was in a treatment program and was not allowed to take pain medication. *Defts' Ex.* B at 12.[2]

Plaintiff also alleged he was forced to live in unsanitary and unsafe conditions. *Resp.* at ¶ 40. He felt that Defendant Stockdale made him live in these conditions as punishment for following the grievance procedure. *Id.* at ¶ 41. Plaintiff was not the only person living in the unsanitary conditions. *Id.* at ¶ 42. He maintains that after grievances were filed nothing was done to change the problem. *Id.* Plaintiff felt that Defendant Stockdale should have come and talked to him about

_____

[2]Page references are to the deposition page number and not the CM/ECF page number.

the problems addressed in his grievances. According to Plaintiff, Defendant Stockdale did not attempt to remedy the conditions Plaintiff filed grievances about. *Defts' Ex.* B at 51-52.

With respect to the conditions, Plaintiff contends Defendant Stockdale refused to provide proper hygiene by not allowing Plaintiff to brush his teeth everyday, not allowing Plaintiff to wash his hands after using the restroom and before eating, and not allowing him out for days at a time. *Resp.* at ¶ 43; *Defts' Ex.* B at 27. Plaintiff further indicates he complained about mold, lack of proper ventilation, wet floors, leaking walls, and no running water in most of the cells. *Resp.* at ¶ 44. He also contends they were only allowed to clean three times in 45 days. *Id.* In his deposition, Plaintiff testified they were offered cleaning supplies on one other occasion, but only to clean the mold off. *Defts' Ex.* B at 27. Plaintiff felt this would only spread the mole spores. *Id.* On January 29, 2016, Plaintiff asked to be a trustee and requested supplies to keep the "jail up and clean." *Resp.* at ¶ 45.

Plaintiff named Defendant Simmons as a Defendant for not letting him clean. *Defts' Ex.* B at 59-60. Plaintiff did believe Defendant Simmons let them clean one time, but only after they raised "a lot of h--- just to get him to do that." *Id.* at 60 & 62. Plaintiff also testified that Defendant Simmons was the officer who told him there was no record of him having been seen by Dr. Halsted. *Id.*

Plaintiff had a bunk, a mattress, and a blanket. *Defts' Ex.* B at 57-58. Although the sink in the cell did not work, there was an operational toilet. *Id.* Water was provided in the morning, when inmates were in the recreation room, and when inmates were in the yard. *Id.* at 54.

Plaintiff testified that Defendant did not allow him to clean "90% of the time" when Plaintiff asked to clean. *Resp.* at ¶ 66. Defendant D'Amico did allow the Plaintiff to clean once or twice but not everyday. *Id.* at 67.

According to Plaintiff, the only time he was allowed to use soap was in the shower. *Resp.* at ¶ 47. Plaintiff believes he got staph infection as a result of not being able to wash his hands before meals. *Id.* at ¶ 49.

Plaintiff was never seen by a doctor for any effects of mold. *Resp.* at ¶ 64. He did not have any problems with allergies or asthma or other breathing problems. *Id.*

Plaintiff maintains he was sexually assaulted by Defendant D'Amico. *Resp.* at ¶ 68. He described the alleged assault in a March 5, 2016, grievance as follows: "something has been bothering me for a few days. A few days ago I was having issues with having a bowel movement. I asked for a suppository. Sal come made me bend over spread my butt cheeks he said it's jail policy he has to watch me push it in my butthole and that is exactly what happened. What the hell is going on her at MCSO." *Id.* at ¶ 69; *Defts' Ex.* A-3 at 71. Plaintiff indicates this was done in front of Plaintiff's cell-mates. *Resp.* at ¶ 70. In response to the grievance, Plaintiff was told it would be given to Defendant Stockdale. *Id.* at ¶ 69. Defendant D'Amico did not physically touch the Plaintiff while Plaintiff was administering the suppository. *Id.* at ¶ 71. Plaintiff felt that Defendant D'Amico wanted to watch for "sexual gratification and he said that it's the only way I was going to get the suppository." *Id.* at ¶ 72. *See also Defts' Ex.* B at 25-26.

With respect to Defendant Stockdale, Plaintiff maintains he not only failed to respond to grievance, but he also failed to take action in response to any of the complaints. *Resp.* at ¶ 74. Plaintiff was never denied the right to file grievances. *Id.* at ¶ 75.

Plaintiff indicates that when he filed the complaint he was not sure what an official capacity claim was. *Resp.* at ¶ 76. Now that he knows what it is, Plaintiff states he wants to sue all Defendants in their personal and official capacities. *Id.* at ¶¶ 76 & 77. Plaintiff indicates that his

official capacity claims are: being denied hygiene items everyday such as soap, a toothbrush, or toothpaste; denial of clean and safe living conditions; being handcuffed and shackled every time he went outside which denied him exercise; and, sexual assault. *Id.* at ¶¶ 78-79.

In support, Plaintiff offers the affidavit of Zachary Summers who was incarcerated in the same cell as the Plaintiff. Summers states:

> The conditions of the cell were as follows: leaking toilets, not running water, black mold on walls & rusted . . . bunks. You weren't permitted to have soap, washcloths, or toothpaste & brus in the cell. You were only permitted to use these items every other day when you could be let out for a shower. The walls & leaking toilets alone was enough to put standing water on the floor & though . . . old & torn blankets were given to use to put against the walls. While in the cell with Mr. Setzer I witnesses him slip on the wet floor & he landed hard on the ground. He quickly started hollering in agony over his back. I helped Mr. Setzer for many days because of his back injury. It took about two weeks of being denied medical treatment before seeing his doctor. He wasn't the only person who suffered by the hands of the officers in Marian Co. Jail.

*Resp.* at pg. 40.

## II. APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III. DISCUSSION

Defendants contend they are entitled to summary judgment on the following grounds: (1) there was no deliberate indifference to Plaintiff's medical needs; (2) Plaintiff suffered no injury as the result of the conditions of confinement; (3) there is no evidence of sexual assault; (4) there is no constitutional right to grievance responses; (5) Defendants are entitled to qualified immunity; and, (6) there is no basis for official capacity liability.

### A. Section 1983

Section 1983 imposes civil liability upon one:

> "who under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

42 U.S.C. § 1983.

Governmental actors may be sued in both their individual and official capacities. *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998). Plaintiff has asserted both types of claims.

### B. Denial of Medical Care

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d

340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the [officers] actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

In order to show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). No argument is made that Plaintiff did not have a serious medical need.

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

It is well settled that deliberate "indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Estelle*, 429 U.S. at 104-05. "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation

or that [these] delays adversely affected his prognosis.'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoting *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995)).

Plaintiff contends his rights were violated by Defendants' 13 day delay in taking him to a doctor following his slip and fall. Plaintiff has provided no evidence that the delay adversely affected his prognosis or that Defendants ignored an acute or escalating condition. Plaintiff did not mention a need for medical care in the grievance he filed following the slip and fall. Further, while it may have seemed unreasonably long to the Plaintiff, he specifically asked that an appointment be made with Dr. Halsted. The Defendants attempted to make Plaintiff an appointment, but were initially told by Dr. Halsted's office that Plaintiff was not a patient of Dr. Halsted. Moreover, I note the Plaintiff was able to move around the pod, shower, and go out for recreation.

While not related directly to the slip and fall, I also note that Plaintiff was twice taken to the emergency room for treatment. There is simply no evidence that Defendants were deliberately indifferent to Plaintiff's serious medical needs. For these reasons, Defendants are entitled to summary judgment on this claim.

### C. Unconstitutional Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time."

*Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989).

The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc., whether brought by pretrial detainees or convicted inmates). Prison condition claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008) (citation omitted).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element." *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Id.* (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels*, 382 F.3d at 875.

Plaintiff contends he was subjected to the following unconstitutional conditions of confinement: (1) mold; (2) wet walls and floors; (3) no running water in cells; (4) being provided cleaning supplies on an erratic and inadequate schedule; (5) only being provided access to toothpaste, a tooth brush, and soap every other day; and, (6) being handcuffed and shackled while on recreation.

13

### 1.  The Mold

Plaintiff contends the mold was so bad that this, coupled with the infrequency of their being provided cleaning supplies, proved inadequate to control the mold.  Plaintiff indicates he only had the opportunity to clean four times in 45 days.  Plaintiff admits that a mold specialist came in February to clean all the cells.  *Defts' Ex.* B at 34.  While Plaintiff was at the jail, he testified the mold problem had not been resolved.  According to Jail Administrator Joe Batterton, the eradication of the mold was complete by August, 2016.  *Defts' Ex.* A at ¶ 10.  Plaintiff did not suffer any injury as a result of the mold.  I do not believe there is a genuine issue of material fact as to whether the mold deprived the Plaintiff of the minimal civilized measure of life's necessities.  *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

### 2.  Wet Walls and Floors

The MCJ "is a small, older facility.  It has 18 beds and was built in the 1970s."  *Defts' Ex.* A at ¶ 9.  According to Plaintiff, the walls sweat or weep and the toilets leak.  Efforts were made to control the water by using a plastic bowl to catch water from the leaking toilet and strips of torn up blankets at the base of the walls.  Plaintiff indicates these efforts were insufficient resulting in the floor frequently being wet.  Plaintiff slipped and fell as a result of the wet floors and suffered a back injury as a result.

It is undisputed that efforts were made to contain both the leaks from the toilets and the water seeping from the walls.  There is simply nothing to suggest the Defendants failed to act in the face of a risk of harm to the health or safety of the detainees at the WCJ.  *See e.g., LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) ("slippery prison floors . . . do not state even an arguable claim for

cruel and unusual punishments") (citation omitted). "[E]very injury suffered by an inmate does not necessarily translate into constitutional liability for prison officials." *Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996). While I do not hold that slippery floors or faulty and leaking toilets can never establish a claim of constitutional dimension, I believe that under the circumstances of this case, no claim of constitutional dimension is stated. *See e.g., Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998) (inmate was on crutches and fell and injured himself several times – his repeated injuries and unsafe conditions state a claim where slippery floors without protective measures create sufficient danger. There is simply nothing in the summary judgment record to support a finding that Defendants failed to maintain a safe area for the detainees or that they were aware there was a substantial risk detainees would fall because of the leaking toilets and that a fall would cause serious harm. *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 110 (8th Cir. 1998) (Plaintiff must prove the officials knew of facts from which they could infer a substantial risk of serious harm existed and that the officials drew that inference).

### 3. No Running Water in Cells

While it undoubtedly would be better if there was running water in the cells from both a cleanliness and a hydration stand point, Plaintiff indicates they were provided with water in the morning, during their hour out, and they were able to shower every other day. The lack of hot or cold running water in the Plaintiff's cell due to the broken sink did not constitute an excessive risk to Plaintiff's health and safety. While sufficient water for drinking and personal hygiene is a minimal life necessity, there is "[n]othing in the Constitution [that] requires . . . each prisoner be provided with clean, cold, warm, or any other form of running water in his cell." *Jelinek v. Roth*,

33 F.3d 56, *2 (7th Cir. 1994) (unpublished) (plumbing in cell that produced only water contaminated with rust that was undrinkable and unsuitable for bathing does not implicate the Eighth Amendment); *see also Smith v. Copeland*, 892 F. Supp. 1218, 1230 (E.D. Mos. 1995) (turning off water in a cell except for brief periods to flush the toilet and providing drinking water with each meal did "not deprive plaintiff of minimally necessary drinking water or hygienic requirements") *aff'd*, 87 F.3d 265 (8th Cir. 1996).

Similarly, it has been held that the fact that an inmate had to wait 10 days for soap/shampoo and seven days for clean clothing and bed linens did not amount to a claim of unconstitutional proportions. *Ratliff v. Sheriff of Burleigh County*, No. 1:13cv-061, 2013 WL 12128697, *5 (D.N.D. June 17, 2013).

### 4.  Erratic Provision of Cleaning Supplies

During his deposition, Plaintiff testified he was offered the opportunity to clean four times during the time he was at the MCJ – from January 27, 2016, until March 11, 2016.  Defendants maintain that inmates are provided cleaning supplies on a weekly basis. *Defts' Ex*. A at ¶ 13.  At this procedural stage, we are not free to disbelieve the Plaintiff.  Rather, we must view the evidence in the light most favorable to him.

The provision of cleaning supplies on the basis asserted by the Plaintiff could certainly be described as miserly, and no doubt resulted in more problems for jail officials in the long run in terms of the negative impact on the inmates both physically and psychologically; however, we cannot say that this objectively rises to the level of a constitutional violation by depriving the Plaintiff of the minimal civilized measure of life's necessities.

### 5.  Hygiene Supplies

According to the Plaintiff, he was only allowed access to toothpaste and soap every other day when he was allowed to shower.  Defendants maintain that inmates are allowed to keep their toothpaste and soap in their cells.  *Defts' Ex.* A at ¶ 12.

Once again, however, we must view the facts in the light most favorable to the Plaintiff. Even doing so, we do not believe a claim of constitutional dimension is stated.  *See e.g. Williams v. Delo*, 49 F.3d 442, 444-445 (8th Cir. 1995) (four days without clothes, running water, tooth brush, tooth paste, deodorant, soap, sheets, blankets, and mattresses did not deprive inmate of the minimal civilized measure of life necessities); *Huggins v. Brassell*, No. 5:08-cv-00216, 2009 WL 856869, *2 (E.D. Ark. March 27, 2009) (no claim of constitutional dimension stated when inmates were provided soap, tooth brush, tooth paste, and deodorant in the shower).  "[A] long-term, repeated deprivation of hygiene supplies violates inmates Eighth Amendment rights." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996) (citing *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)).  Here, Plaintiff testified he was given hygiene supplies every other day when he showered.  I do not believe Plaintiff has shown there is a genuine issue of material fact as to whether the condition was serious enough to deprive him of the minimal civilized measure of life's necessities or whether Defendants were deliberately indifferent to Plaintiff's health or safety.  *Smith*, 87 F.3d at 268.

### 6.  Handcuffed and Shackled while Exercising

Plaintiff contends he was handcuffed and shackled every time he was allowed outside for recreation.  He was not handcuffed or shackled when he exercised in the observation room. Defendants have provided a daily inmate activity log starting on January 27, 2016.  *Defts' Ex.* A-5.

It indicates Plaintiff had outside recreation on January 29, 2016, February 1, 4, 11, 12, 16, 18, 20, 26, 27, and March 5, 2016.  *Id.*  On these 11 dates, Plaintiff testified that the most he could do was shuffle around.  It did, however, allow the Plaintiff the opportunity to be out of his cell and outdoors.

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).  A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened."  *Id.*  Among factors the court should consider in reviewing such a claim are: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and, (4) the duration of confinement.  *Id.*

Here, no claim of constitutional dimension is stated.  Plaintiff was not handcuffed and shackled when allowed to exercise in the observation room.  On the days he went outside, while it is unfortunate and undoubtedly uncomfortable, Plaintiff did get out of his cell, outdoors, and was able to move around in the yard.  Plaintiff offered no evidence to suggest his muscles atrophied or that his health deteriorated from a lack of exercise.  No genuine issue of material fact exists and Defendants are entitled to summary judgment on this claim.

### D.  Sexual Assault

Plaintiff maintains being forced to remove clothing and insert a suppository in front of cellmates and an officer violated his rights and constituted a sexual assault.  There is no evidence suggesting Plaintiff was touched in anyway or that the process took longer than necessary for him to insert the suppository.

Defendants maintain they must be able to verify that an inmate accepted and took the

medication provided. Defendants state this does not change by virtue of the type of medication being offered to the Plaintiff. Defendants argue that by requesting the medication in a suppository form, Plaintiff cannot now complain that the necessity of the officer observing him take the medication violates his constitutional rights.

The Court does not believe there is any evidence in the summary judgment record to suggest that Plaintiff was sexually assaulted. Rather, the question appears to be one of whether Plaintiff's privacy rights were violated.

"[A] prison inmate has a far lower expectation of privacy than do most other individuals in society." *Goff v. Niz*, 83 F.2d 358, 365 (8th Cir. 1986). Inmates retain only "very narrow zones of privacy." *Hell v. McKinley*, 311 F.3d 899, 905 (8th Cir. 2002). "It is fully understood that prison officials must be permitted to enforce reasonable regulations for the orderly operation of a prison and for the safety and health of all prisoners, including those directives reasonably designed to prevent abusive use of drugs." *Sawyer v. Sigler*, 320 F. Supp. 690, 684 (D. Neb. 1970)*, aff'd* 445 F.2d 818 (8th Cir. 1971); *see also Bandy v. Southwick*, No. 06-cv-0173, 2009 WL 749591, *7 (D. Minn. March 18, 2009) ("The fact that Plaintiff was required to abide by the facility's pill window method of dispensing the medication does not demonstrate deliberate indifference"). There are clear security and safety reasons for having medication taken in front of detention center staff.

Under the circumstances existing here, any privacy claim fails. "A number of the limitations on privacy are beyond the inmates' control. Plaintiffs must use the toilet in the presence and view of their cellmates. Cellmates must dress and undress in front of each other with scarce room to move about. Some medical problems can be particularly discomforting . . . [cellmates] must put on or

apply certain medically prescribed items in private areas under full observation of cellmate[s]." *Jensen v. Gunter*, 807 F. Supp. 1463, 1476 (D. Neb. 1992) (finding the alleged destruction of privacy did not violate the Eighth Amendment).

Further, if an attempt is made to equate Defendant D'Amico's actions to that of a strip search, it was not conducted in a manner that exposed Plaintiff to the view of officers or detainees of the opposite sex, did not involve any touching, or physical handling, and there is no allegation that Defendant D'Amico made any humiliating, offensive, or abusive comments. *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012) (addressing strip searches, visual searches, and concluding the courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security); *see also Bell v. Wolfish*, 441 U.S. 520 (1979) (strip searches, including body cavity searches, are not unreasonable or unconstitutional when performed by guards of the same sex); *Houshins v. KQED, Inc.*, 438 U.S. 1 (1978) (institutionalized persons retain certain fundamental rights of privacy and are not subject to indiscriminate viewing by the public).

**E.  Grievance Procedure and Responses**

Plaintiff essentially claims that nothing was done in response to his grievances.  This fails to state a claim of constitutional dimension.

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . .  grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000) (citations

omitted); *see also Lombolt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (denial of grievances does not state a substantive constitutional claim); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("no constitutional right was violated by the defendants' failure, if any, to process all of the grievances [Plaintiff] submitted for consideration"); *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000) (inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Id.* (citation omitted). "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

Plaintiff has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedures. He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because of his exercise of his constitutional rights, or that his ability to exercise any specific constitutional right was chilled by Defendants' actions. Defendants are entitled to judgment in their favor on this claim.

### F.  Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009)

(unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### G.  Official Capacity Liability

"[O]fficial capacity suits 'generally represent only another way of pleading an action against any entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks omitted)).  "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." *Hafer*, 502 U.S. at 25 (internal quotation marks and citations omitted).

The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008).  There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach.  *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable.").  Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability.  *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

*Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted).

On the record before the Court, there is no grounds on which the County could be held liable. Defendants are entitled to summary judgment on the official capacity claims.

## IV. CONCLUSION

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 30) be **GRANTED** and this case be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of April, 2017.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE